## COMMODITY CREDIT CORP. v. PETALUMA & SANTA ROSA R. CO.

No. 12427.

United States Court of Appeals, Ninth Circuit.

July 12, 1951.

H. G. Morison, Asst. Atty. Gen., Frank J. Hennessy, U. S. Atty., C. Elmer Collett, Asst. U. S. Atty., San Francisco, Cal. (Edward H. Hickey, Armistead B. Rood, Attorneys, Dept. of Justice, Washington, D. C., of counsel), for appellant.

George L. Buland, A. T. Suter, San Francisco, Cal., for appellee.

Before BIGGS and STEPHENS, Circuit Judges, and DRIVER, District Judge.

BIGGS, Circuit Judge.

The case at bar presents a difficult question of tariff construction. It was decided in favor of the plaintiff railroad company by the court below. 83 F.Supp. 639. Commodity Credit Corporation, the defendant, has appealed.

On April 11, 1944 Commodity purchased eight carloads of wheat from the Alberta Wheat Pool. We will use one of the cars, viz., L. & N. car No. 10913, as an example.[1]

1. The parties have agreed that the circumstances attendant upon the shipment contained in L. & N. car No. 10913 may be used for the determination of the en-

This car was shipped by the Pool via Canadian Pacific Railway Company, the Pool paying the charges for the first leg of the trip, Commodity paying for the balance of the journey. On the first leg of the trip the car moved from Etzikom in Alberta, to Coutts, in Alberta, or Sweetgrass, in Montana. Coutts or Sweetgrass is a single town which straddles the international border.[2] At Sweetgrass the car was taken over by Great Northern Railway. The shipping order delivered to Canadian Pacific Railway Company designated the destination of the shipment as "Ogden [Utah] and Diversion" and stated that it was "Received subject to the classifications and tariffs in effect on the date of issue of this shipping order, at Etzikom, Alta., [Alberta] April 11, 1944, from Alta. Wheat Pool." The shipment, as originally designated would have moved from Etzikom through Butte, Montana, to Ogden, Utah, and, in the view of Commodity, would have been a through shipment from a point of origin in Canada to a destination in the United States. Webster's New International Dictionary defines the term "through" as applied to transportation as " * * * extending or going from point of departure to destination, or from one end to the other of a route without break, change, reshipment, or the like; often specifically extending, going, or carried over a route that includes two or more lines of transportation without change or reshipment, or under a single contract of shipment * * *" The phrase "through rate" is perhaps unrealistic, however. A more apt phrase would be "single factor rate".

The car was inspected at Lethbridge in Canada.[3] Thereafter, it was diverted twice: first, pursuant to Commodity's letter of April 12, 1944, to Spokane, Washington, for both inspection and diversion; second, at Spokane (Hillyard) by Com-

modity's direction of April 20, 1944, it was again inspected and diverted to Poultry Producers of Central California at Petaluma, California, via Petaluma and Santa Rosa Railroad Company. To sum up: From the time the car left Etzikom until it arrived at Petaluma it had had two diversions and two inspections.

Paragraph 11 of a stipulation[4] filed by the parties states that as to the "Canadian Portion" of the charges 15½¢ per cwt. was for transportation from Etzikom to Sweetgrass and that this charge was calculated according to the applicable tariffs of Canadian Pacific Railway Company; that the "United States Portion" was at the rate of 68¢ per cwt. for transportation from Sweetgrass to Petaluma, California, via Great Northern Railway and connections,[5] via Spokane; and that the 68¢ rate also was applicable "in combination with Canadian rates for shipments from Canadian points received by Great Northern Railway at Sweetgrass".

Petaluma Railroad charged Commodity at the rate of 68¢ per cwt. for the shipments in accordance with the tariff referred to in note 5, supra. Thereafter, Petaluma Railroad, acting in the light of "Item No. 143", Great Northern Railway Company G.F.O. 1240-0, decided that it should have applied a rate of 90¢ per cwt., consisting of (a) the combination of the Great Northern Railway local rate from Sweetgrass to Spokane (40¢), plus (b). the local rate from Spokane to Petaluma (50¢), or a total of 90¢.

The reason why Petaluma Railroad seeks to recover 90¢ instead of 68¢ is the fact that our specimen car was twice diverted and twice inspected. Hence, Petaluma Railroad contends that "Item No. 143" required it to charge rates totalling 90¢. The Item is as follows: "Not more than two inspections (or one inspection in addition to a diversion or reconsignment without inspection)

---

tire controversy. The facts relating to all shipments are substantially similar.

2. That portion of the town lying to the south of the border is known as "Sweetgrass"; that to the north, "Coutts". We will refer to the town as "Sweetgrass".

3. In order to comply with Section 55 of the Canada Grain Act, 1930, 20–21. Geo. V, c. 5.

4. Plaintiff's Exhibit No. 1.

5. It is stipulated that this rate was provided in Pacific Freight Tariff at No. 241–B, Agent J. P. Haynes' I.C.C. No. 1364.

en route and one inspection (or diversion or reconsignment) within the switching limits of the destination at which the car is unloaded will be permitted; Provided, that if, after the car has received the two inspections (or one inspection and one diversion or reconsignment) en route authorized in this rule, it is subsequently inspected (or diverted and reconsigned) and reforwarded without unloading, it will be subject to the combination of tariff rates applicable on a shipment terminating at and on a shipment originating at the point at which such subsequent inspection (or diversion or reconsignment) is performed in effect on date of shipment from point of origin.

"In applying this rule, the number of stops for inspection (or diversion or reconsignments without inspection) shall be reckoned from the last point of loading of car or from the point at which it becomes subject to combination of rates as provided in this rule."

That portion of the first paragraph and sentence of Item No. 143 lying before the first semi-colon provides that not more than one inspection in addition to a diversion will be permitted without application of the combination tariff rates; and if the car, after one inspection and a diversion, is subsequently inspected it will be subject to the combination tariff rates applicable to shipments terminating and originating at the point of subsequent inspection because, in Petaluma Railroad's view, that portion of the first paragraph and sentence of Item No. 143 which lies after the semi-colon must be read in the light of the second paragraph as defining when a car becomes subject to a "combination of rates". This is indeed suggested by the second paragraph of the item. The second paragraph provides that the number of inspections or diversions shall be reckoned from the last place of loading or from the point at which the car became subject to combination rates. It must be observed that the rule is far from plain to the lay-legal eye and neither the court below nor this court has had the bene-

fit of expert testimony as to how Item No. 143 should be construed. It would seem to be the case, however, that the construction of the item and the tariffs would present no difficulty if the shipment had originated in the United States and all the diversions and inspections had taken place therein; and it is clear from the record that both diversions and the second inspection took place within the United States.

We think that it cannot be disputed that the shipment was in the possession of Great Northern Railroad Company at Spokane (Hillyard) at the times when the second diversion order was presented to the railroad by Commodity and the second inspection was made. Indubitably, the car was inspected first at Lethbridge in Canada. Petaluma's argument is that no flat through rate was ever applicable and that the combination rates became operable at Spokane because the provisions of Item No. 143 were applicable at that point, the combination rates there going into effect. The combination rates there became assessable, the combination rates applicable, as we have stated, being that from Sweetgrass to Spokane (40¢) plus that from Spokane to Petaluma (50¢), or a total of 90¢. To sum it up: Petaluma contends that the shipment became subject to a combination of rates as provided by Item No. 143 at Spokane.[6]

Commodity points out that the framers of Item No. 143 did not have in mind a shipment of the sort which we have before us, and that the Lethbridge inspection should not be deemed to fall within the purview of Item No. 143 because it occurred in Canada. Commodity contends that since under the established rule of the Interstate Commerce Commission each factor of a flat combination of rates shall be deemed to carry with it the privileges pertaining to each factor, it is entitled to the benefit of the 68¢ rate and that, therefore, the shipment should be treated as one originating at Sweetgrass and the Lethbridge inspection should not be counted. This construction, if it were acceptable would require us to consider the

6. Of course if the provisions occurring in the first part of the second paragraph of Item No. 143 were applicable and inspections and diversions should be reckoned from the point of loading, viz., Etzikom, there would be no question as to Commodity's liability for the higher rate.

inspection at Spokane as a privilege inhering in a single factor rate, viz., the 68¢ rate, from Sweetgrass to Petaluma, and no charge would be incurred by reason of the inspection.

█ Commodity's view finds some support in the action taken at a meeting of The National Diversion and Reconsignment Committee [Docket Advice No. NDR–1182, Topic No. 13, Publication Announcement No. 154] whereby Rule 5, captioned, "Number of Inspections Allowed" was put into effect on February 16, 1949. Rule 5 was the same in tenor as the second paragraph of Item No. 143 except that the clause "or the point where the car comes in possession of carriers within the United States," has been inserted after the word "car", first occurrence, and the word "or", third occurrence, in Item No. 143. The Publication Announcement stated that, "The above mentioned change is for clarification purposes." It would appear, therefore, as if The National Diversion and Reconsignment Committee put the same interpretation upon Item No. 143 as did Petaluma Railroad in the first instance, contrary to the opinion of the court below. But to state it bluntly, the change effected in Item No. 143 seems to us to constitute an amendment rather than a "clarification". In any event, though the interpretation of The National Diversion and Reconsignment Committee is entitled to great weight it is not binding upon us.

█ We must decide between these conflicting views and the decision is not an easy one. There is no doubt, however, that the provisions of Item No. 143, applied literally, justified the combination rates on which Petaluma insists. No exception in favor of a shipment originating at a point in Canada or at any other point is expressly set out in the item. The only plausible alternative is to say boldly, as does Commodity, that the provisions of Item No. 143 simply were not intended to apply where the shipment originates in Canada and there has been a Canadian inspection. But no through or single factor rate shipment from a point in Canada to a point in the United States was ever contemplated by the parties and such a shipment was not carried out. A combination rates shipment was always in contemplation. The fact that the Alberta Wheat Pool shipped to the border point seems immaterial. It is not the shipper but the character of the shipment which counts. Since the shipment was intended to be a continuous one from one point to another, and since, had it originated in the United States instead of Canada, it clearly would have been subject to the provisions of Item No. 143, we can perceive no basis in reason for the distinction that Commodity would make.[7] Rates for goods shipped from a point in Canada to a point within the United States should be on a parity with rates for a shipment from a point in the United States to another point within the United States. To take the contrary view is, we think, to make too much of an imaginary line, the international boundary, lying between two friendly Nations whose railroad systems, to a large extent at least, are treated as continuations of each other. Under the circumstances of this case too much must not be made of a border incident.

Accordingly, the judgment is affirmed.

7. Nor are we unmindful of the fact that Item No. 143 was a wartime regulation inaugurated on October 20, 1942 for the purpose of conserving cars and keeping traffic moving by restricting the number of inspections and diversions permitted.